NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

In re:                                                              :
                                                                    :
MICHAEL D. BARNETT and DENISE A.       :          Chapter 7
BARNETT,                                            :
                                                                    :          Case No. 12-37991  (CGM)
                                            Debtors     :

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

MARK TULIS, as the chapter 7 trustee,

                                            Plaintiff,      :
                                                                    :
v.                                                                 :          Adv. No. 14-09036 (CGM)
                                                                    :
M.E.-R.E. HOLDING, LLC, et al.,                 :
                                                                    :
                                            Defendants

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x


**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART THE
TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**


<u>A P P E A R A N C E S</u> :

Wilson, Elser, Moskowitz, Edelman et ano
1133 Westchester Avenue
White Plains, NY 10604
*Attorney for the Chapter 7 Trustee*
          By:     Kathleen A. Daly
                    David L. Tillem


McCabe & Mack LLP
63 Washington Street
P.O. Box 509
Poughkeepsie, NY 12602
*Attorney for Defendant Alexander Gellatly*
          By:     Richard R. DuVall

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Trustee's Motion for Summary Judgment (the "Trustee's Motion"

or "Motion") on his fifth cause of action in the adversary proceeding against Alexander Gellatly

("Gellatly") and M.E.-R.E. Holding, LLC[1] ("Holding").  *See* Compl., Oct. 22, 2014, ECF No. 1.[2]

The Trustee's fifth cause of action "demands judgment against Gellatly in the sum of

$1,953,794.00, plus interest from May 15, 2013," on five promissory notes (the "Notes").

Compl. ¶ 70.  For the reasons set forth below, the Court grants in part and denies in part the

Trustee's Motion.

## Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. §

157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated

January 31, 2012.  This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) ("matters

concerning the administration of the estate") and (E) ("orders to turn over property of the

estate").

## Background

On November 30, 2012, Michael D. Barnett ("Mr. Barnett") and Denise A. Barnett ("Ms.

Barnett") (collectively the "Debtors") filed a joint bankruptcy petition, seeking Chapter 7 relief.

*See* Petition, *In re Barnett*, No. 12-37991 (Bankr. S.D.N.Y. Nov. 30, 2012), ECF No. 1

("Petition").  Prior to bankruptcy, Debtors retained ownership interests in several real estate

companies, including (1) Route 299 Retail Center, LLC ("Retail Center"), (2) DJ Orchard, LLC

("DJ Orchard"), (3) Wappinger Gardens, LLC ("Wappinger Gardens"), (4) Vineyard Commons

---

[1] The Trustee settled all claims against Holding on January 22, 2015.  Order Approving Settlement 2, Jan. 22, 2015, ECF No. 19.  The remaining claims are against Gellatly.  *See id.*
[2] Unless otherwise indicated, references to documents filed in the case can be found on the docket of adversary proceeding 14-09036.

Holding, LLC ("Vineyard Commons"), and (5) Highland Square Development, LLC

("Highland"). *See* Compl. ¶ 8; Answer and Countercls. Exs. 1–5, Dec. 15, 2014, ECF Nos. 12-1,

12-2, 12-3, 12-4, 12-5 ("Answer"). On September 17, 2010, by way of five purchase agreements

("Purchase Agreements"), Ms. Barnett sold Gellatly a percentage of her interests in each of the

above-mentioned real estate companies. *See* Compl. ¶ 8; Answer Exs. 1–5; Defendant's

Counter-Statement of Material Facts ("Def.'s SMF") ¶ 1, Aug. 6, 2015, ECF No. 50;[3] Decl.

David L. Tillem Supp. Trustee's Mot. Summ. J. ("Tillem Decl. Summ. J.") Ex. D Part 1 ("Ex.

D.1"), at 25–62; Ex. D Part 2 ("Ex. D.2"), at 2–24, July 9, 2015, ECF Nos. 43-6, 43-7. In

exchange, the Purchase Agreements called for at least partial payment by promissory note, to be

due on May 15, 2013. *See* Answer Exs. 1–5; Tillem Decl. Summ. J. Ex. D.1, at 26, 38, 50; Ex.

D.2, at 3, 15. The same day the Purchase Agreements were signed, Gellatly also executed five

Notes, payable to Denise Barnett. Tillem Decl. Summ. J. Exs. F-1, F-2, F-3, F-4, F-5, July 9,

2015, ECF Nos. 43-10, 43-11, 43-12, 43-13, 43-14.

On May 18, 2011, roughly eight months after Gellatly executed the Notes, both of the

Debtors entered into a commercial note (the "Commercial Note") with Wallkill Valley Federal

Savings & Loan Association ("Wallkill") for $500,000. Def.'s SMF ¶ 10 (denying knowledge or

information sufficient to form a belief as to whether Debtors executed the Commercial Note in

favor of Wallkill); *see also* Compl. Ex. D; Tillem Decl. Summ. J. Ex. H, at 2–3, July 9, 2015,

ECF No. 43-21. Under the terms of the Commercial Note, payments were scheduled to end on

April 18, 2013. Tillem Decl. Summ. J. Ex. H, at 2. The entire balance would become due and

payable on May 18, 2013. *Id.* On the same day Debtors entered into the Commercial Note, May

18, 2011, Ms. Barnett granted Wallkill a security interest in each of Gellatly's Notes as collateral

to support the Commercial Note. Def.'s SMF ¶ 11; *see also* Tillem Decl. Summ. J. Exs. I-1, I-2,

---

[3] Unless otherwise stated, all facts cited to in the parties' Statements of Material Facts are undisputed.

I-3, I-4, I-5, July 9, 2015, ECF Nos. 43-22, 43-23, 43-24, 43-25, 43-26; Compl. Ex. E.  The five

security agreements ("Security Agreements") conditionally transferred to Wallkill "all of the

right, title and interest of Assignor in and to . . . certain Promissory Note[s] dated September 17,

2010, made by Alexander Gellatly, to Denise Barnett," effective upon Ms. Barnett's default on

the Commercial Note.  *See, e.g.*, Tillem Decl. Summ. J. Ex. I-5.[4]  Prior to default, Ms. Barnett

retained "the right to collect upon all installment payments due on the Assigned Note and to

retain, use and enjoy the same."  *Id.*

Before entering into the Commercial Note, the Debtors had Gellatly execute five estoppel

certificates, certifying that Gellatly had no defenses to the Notes.  Def.'s SMF ¶ 6; Compl. Ex. B;

*see also* Tillem Decl. Summ. J. Exs. G-1, G-2, G-3, G-4, G-5, July 9, 2015, ECF Nos. 43-15, 43-

16, 43-17, 43-18, 43-19.  Gellatly affirms in each certificate that the corresponding Note "is due

and payable in the original principal amount and that there are no defenses or offsets to

said . . . Note."  *See, e.g.*, Tillem Decl. Summ. J. Ex. G-1.[5]  The certificates conclude that

Gellatly

> makes this covenant and declaration not only for the benefit of the holder of
> the . . . Note, but for the benefit of any subsequent holder of said Note, the
> undersigned intending that such subsequent holder or assignee shall rely upon this
> covenant and declaration in accepting an assignment of said . . . Note.

*Id.*  After the Debtors entered into the Commercial Note with Wallkill, Gellatly executed a sixth

estoppel certificate on May 27, 2011.  Def.'s SMF ¶ 7; Tillem Decl. Summ. J. Ex.G-6, July 9,

2015, ECF No. 43-20; Compl. Ex. C.  The sixth certificate was given by Gellatly "for the benefit

of Denise Barnett . . . ."  Tillem Decl. Summ. J. Ex. G-6.  Gellatly further certified "[t]hat he is

justly indebted to [Ms. Barnett] in the amount of $2,253,794.00 pursuant to the terms of the

Notes as amended and as further amended and that [Gellatly] has no offsets or defenses to the

---

[4] The language of the five Security Agreements is substantially similar.
[5] Unless otherwise indicated, the five estoppel certificates are virtually identical, save the name of the Note.

debt evidence by the Notes;" and that he "makes this covenant and declaration not only vfor [sic] the benefit of the holder of the Notes, butr [sic] for the benefit of any subsequent holder of the Notes or any of them . . . ." *Id.*

Neither the Debtors nor Gellatly defaulted on their respective obligations until after the Debtors filed for bankruptcy. Def.'s SMF ¶¶ 4, 36, 15–17;[6] Tillem Decl. Summ. J. Ex. H; Tillem Decl. Summ. J. Ex. J, July 9, 2015, ECF No. 43-27. The Debtors' scheduled payments to Wallkill did not end until April 18, 2013. Tillem Decl. Summ. J. Ex. H, at 2. As of April 24, 2013, the Trustee claims that Debtors still owed Wallkill $463,913.10 on the Commercial Note. Tillem Decl. Summ. J. Ex. J. On April 24, 2013, Wallkill demanded payment from Gellatly. Def.'s SMF ¶ 16; *see also* Tillem Decl. Summ. J. Ex. J. On May 15, 2013, Gellatly's obligation on the Notes came due. Tillem Decl. Summ. J. Exs. F–1–F-5. Gellatly did not make any payments on the Notes. Def.'s SMF ¶ 36. On July 31, 2013 in an agreement (the "Agreement"), approved to the extent so-ordered by this Court, Wallkill transferred its security interest to the Trustee. *See* Order Approving Agreement, *In re Barnett*, No. 12-37991, ECF No. 54; *see also* Def.'s SMF ¶¶ 18, 19, 22; Tillem Decl. Summ. J. Ex. A, at 10, July 9, 2015, ECF No. 43-2.

The Agreement provided that after Wallkill assigned and delivered the Notes and the Security Agreements to the Trustee, Wallkill was to "timely file a proof of claim in the Barnett bankruptcy case regarding the amounts due for the Commercial Note as of the date of the bankruptcy filing." Tillem Decl. Summ. J. Ex. A, at 13. Under the Agreement's terms, "[t]he Trustee acknowledges a Total Due to Wallkill under the Commercial Note in the sum of $463,913.10 as of April 24, 2013," and promises that "[t]he Trustee shall use reasonable efforts to enforce the payment provisions of the [Original] Notes and recover the amounts due

---

[6] Gellatly "denies knowledge or information sufficient to form a belief as to the truth of the allegations" in paragraphs 15 and 17. Def.'s SMF ¶¶ 15, 17.

thereunder, including, but not limited to the commencement of litigation against Gellatly, if necessary, at the expense of the estate." *Id.* The Agreement also promises that Wallkill will be paid first from the sums recovered on the Notes until it is paid in full. *Id.* at 14. The Trustee may keep any funds in excess of the amount due to Wallkill. *Id.*

On July 9, 2015, the Trustee filed his Motion, seeking to recover "the amounts due" on all five of the Notes. Trustee's Mem. Law Supp. Summ. J. 1, 10, July 9, 2015, ECF No. 45 ("Mem. Summ. J."). The Trustee claims the assignment of Wallkill's security interest provides him the authority to enforce the Notes against Gellatly. *Id.* at 5. The Trustee asserts that summary judgment is appropriate due to the fact Gellatly executed the Notes and failed to pay when they came due. *Id.* at 1, 10. The Trustee argues that he is not subject to Gellatly's defenses to payment on the Notes due to his holder in due course status and the estoppel certificates. *Id.* at 1, 5, 6–8.

Gellatly filed an opposition on August 6, 2015. Gellatly claims that the Trustee does not have the power to enforce the Notes against Gellatly. Mem. Law Opp'n to Mot. Summ. J. 1, Aug. 6, 2015, ECF No. 51 ("Def.'s Mem. in Opp'n"). Gellatly argues the Trustee takes the Notes subject to Gellatly's defenses as the Trustee is not a holder in due course and may not rely on the estoppel certificates. *Id.* at 2–6. Gellatly asserts that summary judgment is not warranted here as there are genuine issues of material fact regarding Gellatly's defenses to payment. *See id.* at 21. Gellatly claims that three of the five Notes, including the Wappinger Gardens Note, the Highland Note, and the Retail Center Note, are void due to a failed condition precedent in the Purchase Agreements. *Id.* at 15.

The Trustee replied on September 15, 2015.  In his Reply, the Trustee seeks to recover a reduced amount[7] on only three of the five Notes.  *See* Trustee's Reply Mem. of Law Supp. Summ. J. 1, 19, Sept. 15, 2015, ECF No. 58 ("Reply Mem.").  The Trustee's Reply concedes that "in the absence of certain technical requirements, the Trustee cannot assert holder in due course status vis-a-vis the assignment from Wallkill . . . ."  *Id.* at 1.  Specifically, "the Trustee acknowledges that the absence of the words 'to the order of' precludes a finding that the Note holder can assert holder in due course status."  *Id.* at 4.  The Trustee's Reply also concedes that

> because two of the five Notes and accompanying Purchase Agreements executed by Gellatly appear to contain conditions precedent that were not met, recovery on those two Notes is unlikely.  That however, does not automatically mean that summary judgment in favor of the Trustee is not specifically mandated in his favor and against Gellatly on **the remaining three Promissory Notes** which, with interest, are currently valued at approximately $1.149 million? [sic]

*Id.* at 1–2 (emphasis in original).

The Trustee asserts Gellatly has not come forward with any admissible evidence to show he is not in default on the Notes or that payment is not owed.  *Id.* at 2.  Even though the Trustee cannot be a holder in due course, the Trustee argues that based on his "interest as a holder on behalf of the Estate, the Trustee certainly has the right to seek payment on the DJ Orchard, Wappinger Gardens and Vineyard Commons Notes for the simple reason that Gellatly has expressly waived any defenses and offsets."  *Id.* at 2–3.  In the event the Court finds Gellatly has not waived his defenses, the Trustee argues that Gellatly does not offer any admissible evidence to raise a genuine issue of material fact.  *Id.* at 3.

## Discussion

### I.    STANDARD OF LAW FOR SUMMARY JUDGMENT

---

[7] The Reply seeks a total of "$920,467.23 together with interest from the date of the default at ten percent (10%) per annum."  Reply Mem. 19.

Federal Rule of Civil Procedure 56(a), made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, states that a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056.  Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted) (internal quotation marks omitted).

The moving party "bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (citation omitted) (internal quotation marks omitted).  The Rule "does not require the moving party to *negate* the elements of the nonmoving party's case; to the contrary, 'regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990) (quoting *Celotex*, 477 U.S. at 323).

A court must grant a motion for summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  On a motion for summary judgment, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).

## II. THE TRUSTEE'S BURDEN ON SUMMARY JUDGMENT

To grant summary judgment on a promissory note, the movant must establish "proof of a note and a defendant's failure to make payment according to its terms." *Bankers Trust Co. v. F.D. Rich & Co.*, 1991 WL 221091, at *2 (S.D.N.Y. Oct. 16, 1991). Where "[e]xecution and default hav[e] been conceded, it [i]s incumbent on defendants to come forward with evidentiary proof sufficient to raise an issue as to the defenses." *Seaman-Andwall Corp. v. Wright Mach. Corp.*, 295 N.Y.S.2d 752, 754 (N.Y. App. Div. 1968) *aff'd*, 273 N.E.2d 138 (N.Y. 1971). Gellatly argues that the Court must read the Notes in conjunction with the accompanying Purchase Agreements and construe them as a single contract. Def.'s Mem. in Opp'n 23. Before the Court can ascertain whether the Trustee has proved his prima facie case for breach, it is necessary to determine the contours of the contract.

To determine whether two writings are independently complete, the Court must look to the manifested intent of the parties in light of the surrounding circumstances. *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) (quoting *Bourne v. Walt Disney Co.*, 68 F.3d 621, 627 (2d Cir.1995)) (internal quotation marks omitted); *see also Williams v. Mobil Oil Corp.*, 445 N.Y.S.2d 172, 175 (N.Y. App. Div. 1981) (citations omitted). "Generally, the rule is that separate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement." *Williams*, 445 N.Y.S.2d at 175 (citations omitted).

This is true even though "in one of the contracts it is stated that there are not other contracts between the parties . . . ." *Id.*

The Court finds that the Notes and the Purchase Agreements should be treated as a single agreement. Gellatly executed both the Purchase Agreements and the Notes on the same day, September 17, 2010. *See* Tillem Decl. Ex. D.1, at 25, 33, 37, 45, 49, 57; Ex. D.2, at 2, 10, 14, 22. Each Purchase Agreement and corresponding Note calls for a payment in the same amount of money. Tillem Decl. Ex. D.1, at 26, 33, 38, 45, 50, 57; Ex. D.2, at 3, 10, 15, 22. Paragraph 1.2 of the Purchase Agreements calls for partial payment of the purchase price by promissory note, to be due May 15, 2013. Tillem Decl. Ex. D.1, at 26, 38, 50; Ex. D.2, at 3, 15. The Notes matured on the same day, May 15, 2013. Tillem Decl. Ex. D.1, at 33, 45, 57; Ex. D.2, at 10, 22. The Notes each reference the corresponding Purchase Agreement for a description of the membership interests Ms. Barnett pledged to Gellatly. *See id.* The Court finds that based on the circumstances, the Notes and the Purchase Agreements should be read together as a single agreement, expressing the parties' complete understanding.

The Court finds that the Trustee has met his prima facie burden for summary judgment. The Trustee has provided copies of the Notes and Purchase Agreements, signed by Gellatly, in exchange for the transfer of membership interests from Ms. Barnett. *See* Compl. Ex. A; Answer Exs. 1–5; Def.'s SMF ¶¶ 1, 43, 44; Def.'s Mem. in Opp'n 24; Tillem Decl. Summ. J. Ex. D.1, at 25–62; Ex. D.2, at 2–24. It is undisputed that Gellatly executed the Notes and Purchase Agreements, and has not paid on the Notes, constituting breach. Answer ¶ 8; Def.'s SMF ¶¶ 35, 36. It is now upon the non-moving party to come forward with evidence "establishing the existence of a triable issue with respect to a bona fide defense." *Rodrigues v. Samaras*, 987 N.Y.S.2d 78, 80 (N.Y. App. Div. 2014) (citations omitted).

## III. STANDING

Gellatly argues that the Trustee only has standing to sue on the Notes as the representative of Ms. Barnett's bankruptcy estate and, as such, may only assert her rights to payment. Def's Mem. in Opp'n 13–14. Gellatly contends that as the initial payee, Ms. Barnett would be subject to all Gellatly's defenses. *Id.* Gellatly argues that the Trustee may not enhance his legal rights based on the assignment of Wallkill's security interest. *Id.* at 13. Gellatly argues that the Trustee does not have standing to assert Wallkill's legal rights on the Notes, and that instead "the Trustee's only standing to seek payment under the Notes is because he succeeded to [Ms. Barnett]'s 'payee' status when she and her husband . . . filed their joint petition." *Id.* at 14. Gellatly is mistaken.

Standing to bring an action is a jurisdictional prerequisite for suit. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) (cited in *McHale, Jr. v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 191–92 (Bankr. S.D.N.Y. 2009)). Constitutional standing requires "a personal stake in the outcome of the controversy." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)) (internal quotation marks omitted); *see also Pereira v. EisnerAmper LLP (In re Waterford Wedgwood USA, Inc.)*, 529 B.R. 599, 603 (Bankr. S.D.N.Y. 2015). The litigant must "'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.)*, 721 F.3d 54, 58 (2d Cir. 2013) (quoting *Warth,* 422 U.S. at 499). In bankruptcy, the trustee's standing depends on whether the claim is properly considered property of the estate. *See Wagoner*, 944 F.2d at 118.

### A. The Trustee's Standing to Bring Suit on Ms. Barnett's Pre-Petition Claim

Under 11 U.S.C. § 323, the chapter 7 bankruptcy trustee "is the representative of the estate," and "has capacity to sue and be sued." The trustee is further directed to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest . . . ." 11 U.S.C. § 704(a)(1). "Under the Bankruptcy Code the trustee stands in the shoes of the [debtor] and has standing to bring any suit that the [debtor] could have instituted had it not petitioned for bankruptcy." *Wagoner*, 944 F.2d at 118 (citing 11 U.S.C. §§ 541, 542; *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 429 (1972); *Cissell v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir.1975), *cert. denied,* 423 U.S. 1074 (1976)).

Under the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Property of the estate also includes "any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). Property of the estate has been broadly interpreted to include "all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property . . . ." *Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 691 (Bankr. S.D.N.Y. 2008) (quoting *Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984)) (internal quotation marks omitted). Property of the estate includes the debtor's right to receive future payments, even though at the time of filing that right may be contingent or unmatured. *See Neuton v. Danning (In re Neuton)*, 922 F.2d 1379, 1382–83 (9th Cir. 1990); *Mason v. Costello (In re Klarchek)*, 508 B.R. 386, 395 (Bankr. N.D. Ill. 2014) (citations omitted).

Here, there is no dispute that Ms. Barnett is the payee on the Notes and would have a claim in her own name against Gellatly. *See* Def.'s SMF ¶¶ 1, 24. As was so ordered by this

Court, Ms. Barnett's bankruptcy estate is entitled to any and all remaining funds recovered on the Notes after satisfaction of the debt owed to Wallkill. *See* Tillem. Decl. Summ. J. Ex. B. Ms. Barnett retained an interest in the Notes at all times, despite the fact that she granted a security interest in the Notes to Wallkill. The Security Agreements did not void Ms. Barnett's payee status on the Notes. Wallkill was never entitled to keep more than what the Debtors owed it under the Commercial Note. *See, e.g.*, Tillem Decl. Summ. J. Ex. I-5, at ¶ 5. Although the Security Agreements purport to transfer all of Ms. Barnett's "right, title and interest" in the Notes to Wallkill, those terms are only effective so long as the Commercial Note is in default and Wallkill's debt has not been repaid. *Id.* at ¶ 1. Effectively, Ms. Barnett only transferred a portion of her right to payment to Wallkill. At the time the Debtors filed for bankruptcy, Ms. Barnett had a right to payment on the Notes. That right, pursuant to § 541(a)(1), is property of the estate. The Trustee, as the representative of Ms. Barnett's estate, has standing to enforce Ms. Barnett's right to payment on the Notes.

### B. The Trustee's Standing to Bring Suit on the Assignment from Wallkill

It is well established that "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Id.* (citations omitted). While that is the general rule, a trustee has the right to "bring claims founded, *inter alia,* on the rights of the debtor and on certain rights of the debtor's creditors . . . ." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995) (citations omitted). A trustee has standing to sue on assigned creditors' claims where the recovery of damages would inure to the benefit of the bankruptcy estate. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 134 (2d Cir. 1993) (distinguishing *Williams v. Cal. 1st Bank*, 859 F.2d 664, 667 (9th Cir. 1988)). So long as the trustee is not seeking to recover primarily for

the benefit of specific creditors, the trustee, as the representative of the debtor's estate, is still the real party in interest. *Schnelling v. Thoman (In re AgriBioTech, Inc.)*, 319 B.R. 207, 212–13 (D. Nev. 2004) (discussing *Williams*, 859 F.2d 665–67).

Here, the Trustee validly acquired Wallkill's rights to payment on the Notes as property acquired by the estate under § 541(a)(7). "Under New York law, 'an assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, or chattel, or other thing.'" *Rhythm & Hues, Inc. v. Terminal Mktg. Co.*, 2004 U.S. Dist. LEXIS 7625, at *28 (S.D.N.Y. May 4, 2004) (quoting *In re Stralem*, 758 N.Y.S.2d 345 (N.Y. App. Div. 2003)) (internal quotation marks omitted). The parties to a transaction may limit the assignment, so long as the terms are express. *See, e.g.*, *id.* at *29–30 (citing *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 856 (2d Cir. 1997)). Even though the assignment is conditional, that does not prevent it from being a valid assignment. *Maloney v. John Hancock Mut. Life Ins. Co.*, 271 F.2d 609, 614 (2d Cir. 1959) (citations omitted).

Wallkill validly and completely assigned its security interest in the Notes to the Trustee after the filing of the Debtors' bankruptcy petition. *See* Def.'s SMF ¶¶ 18, 19, 22; Tillem Decl. Summ. J. Exs. A, B. The Trustee gave valuable consideration to Wallkill in exchange for the assignment and changed his position as a result. In the Agreement, the Trustee stated his belief "that Wallkill has a valid and enforceable security interest in the . . . Notes," acknowledged "a Total Due to Wallkill under the Commercial Note in the sum of $463,913.10," and promised "to enforce the . . . Notes at the expense of the estate . . . ." Tillem Decl. Summ. J. Ex. A, at 12, 13. The Trustee agreed to pay Wallkill a sum recovered out of this litigation. The Trustee essentially recognized a claim against the estate for money he otherwise would have been able to claim as

property of the estate.  *See* 11 U.S.C. § 541(a)(7).  Additionally, the only way for Wallkill to re-

appropriate its security interest is by order of the Court.  Tillem Decl. Summ. J. Ex. B.  The

Trustee took a valid assignment for the primary benefit of the estate and may properly bring suit

on the Notes as Wallkill's assignee.

The Trustee has standing to assert Wallkill's claim to payment on the Notes, as it is

properly a claim of the Debtors' bankruptcy estate.  The Trustee is primarily seeking to enforce

the Notes for the benefit of the estate.  The amount owed to Wallkill is much less than the total

amount allegedly due to the Debtors on the Notes.  Under the Agreement's terms, and as ordered

by this Court, Wallkill is entitled to receive the first $463,913.10 recovered from this litigation.

Tillem Decl. Summ. J. Ex. B; Ex. A, at 13.  The Trustee's motion for summary judgment claims

that the total amount currently due on the Notes is around $1,900,000,000.  Tillem Decl. Summ.

J. ¶ 3, July 10, 2015, ECF No. 47.  Although Wallkill will be paid first from the sums recovered,

the Trustee will keep all funds in excess of the amount due to Wallkill.  Tillem Decl. Summ. J.

Ex. B; Ex. A, at 13.  Less than half of the amount recoverable on the Notes will be owed to

Wallkill.  The primary recovery would be to the estate.  By taking the assignment of Wallkill's

security interest in the Notes, the Trustee marshalled the assets of the estate pursuant to § 704 for

the benefit of the estate.  The assignment allows the Trustee to more effectively pursue the

claims against Gellatly in a single effort.  *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831

F.2d 1339, 1342 (7th Cir. 1987).

Accordingly, "[a]s assignee, the trustee stands in the shoes of the [creditors], thereby

assuming all rights and interests that the [creditors] have in the causes of action and becoming

subject to all defenses that could have been asserted against the [creditors], not [the debtor]."

*Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 514 (4th Cir. 2005) (citations

omitted); *see also BC Liquidating, LLC v. Weinstein (In re BC Funding, LLC)*, 519 B.R. 394,

415 (Bankr. E.D.N.Y. 2014).  As the Trustee has standing to bring suit as Wallkill, the Trustee

may also assert the rights of Wallkill.

### IV.  STATE LAW RIGHTS TO ENFORCE THE NOTES AGAINST GELLATLY

As stated above, there is no question that Ms. Barnett could enforce the Notes against

Gellatly.  Despite Gellatly's objections to the contrary, the Trustee also has the power under New

York law to enforce payment on the Notes against Gellatly based on the assignment of Wallkill's

security interest.  A security interest attaches to collateral when it is enforceable against the

Article 9 debtor.[8]  N.Y. U.C.C. § 9-203(a).  A security interest is enforceable against the debtor

and third parties where "(1) value has been given; (2) the debtor has rights in the collateral or the

power to transfer rights in the collateral to a secured party;" and one of the four evidentiary

requirements is met.  N.Y. U.C.C. § 9-203(b).  Where the security interest is in tangible

negotiable documents or instruments, the secured party may both create an enforceable security

interest and perfect that interest by possession of the collateral.  N.Y. U.C.C. §§ 9-203(b)(3)(B),

9-313.  Under § 9-607, "after default, a secured party: (1) may notify an account debtor or other

person obligated on collateral to make payment or otherwise render performance to or for the

benefit of the secured party," and "(3) may enforce the obligations of an account debtor or other

person obligated on collateral and exercise the rights of the debtor with respect to the obligation

of the account debtor or other person obligated on collateral to make payment or otherwise

render performance to the debtor . . . ."  N.Y. U.C.C. § 9-607(a)(1), (3).

Here, Wallkill had a perfected security interest in the Notes and was entitled to enforce

the Notes against both Ms. Barnett and a third party obligated on the collateral.  N.Y. U.C.C. §§

---

[8] Article 9 of the New York Uniform Commercial Code defines a debtor as "(A) a person having an interest, other than a security interest or other lien, in the collateral, whether or not the person is an obligor; (B) a seller of accounts, chattel paper, payment intangibles, or promissory notes; or (C) a consignee."  N.Y. U.C.C. § 9-102(a)(28).

9-203(b), 9-313(a), 9-607(a)(1), (3).  Wallkill took a security interest in the Notes for value, as collateral for the $500,000 loan that Wallkill extended to Ms. Barnett.  Compl. ¶¶ 18, 19; Def.'s SMF ¶ 11; Tillem Decl. Summ. J. Ex. H; Ex. I-1–I-5.  Ms. Barnett also gave possession of the Notes to Wallkill, perfecting Wallkill's security interest in the Notes.  N.Y. U.C.C. §§ 9-203(b), 9-313(a); Compl. ¶ 19; Def.'s SMF ¶ 12 (denying knowledge or information sufficient to form a belief as to the truth of the allegation that Ms. Barnett delivered the Notes to Wallkill).  Wallkill then had the right to enforce the entire obligation against a "person obligated on collateral," to make payment.  *See* N.Y. U.C.C. § 9-607 official cmts. 3, 6.  Gellatly is obligated to make payment on the Notes.  Def.'s SMF ¶ 11.  Wallkill would have been able to enforce the Notes against Gellatly.

Wallkill assigned and delivered the Notes to the Trustee for value, allowing the Trustee to enforce the Notes against Gellatly.  Compl. ¶ 20; Tillem Decl. Summ. J. Ex. A, at 12; Def.'s SMF ¶ 25 (denying knowledge or information of the truth of the allegation that the Trustee took delivery of the Notes).  The Trustee gave valuable consideration to Wallkill in exchange for the assignment and changed his position as a result.  In the Agreement, the Trustee stated his belief "that Wallkill has a valid and enforceable security interest in the . . . Notes," acknowledged "a Total Due to Wallkill under the Commercial Note in the sum of $463,913.10," and promised "to enforce the . . . Notes at the expense of the estate . . . ."  Tillem Decl. Summ. J. Ex. A, at 12, 13. The Trustee agreed to pay Wallkill a sum recovered out of this litigation.  The Trustee essentially recognized a claim against the estate for money he otherwise may have been able to claim as property of the estate.  *See* 11 U.S.C. § 541(a)(7).  The only way for Wallkill to re-appropriate its security interest is by order of the Court.  Tillem Decl. Summ. J. Ex. B.

An assignee takes with all the rights of the assignor and may bring suit to enforce the

claim. *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 502 (S.D.N.Y.

2013) (citing *Hosp. for Joint Diseases v. Travelers Prop. Cas. Ins. Co.*, 879 N.E.2d 1291, 1296–

97 (N.Y. 2007) (Pigott, J., dissenting); *LaSala v. Needham & Co.*, 2006 WL 452024, at *4–5

(S.D.N.Y. Feb. 24, 2006); *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773

(2000)). The Trustee takes with all the rights to enforce that Wallkill had. The Trustee may, as

the assignee of Wallkill, enforce payment on the entire amount due on the Notes.

## V. RIGHT TO TAKE THE NOTES FREE OF DEFENSES

The Trustee claims that he is entitled to take the Notes free of any defenses Gellatly may

have. Mem. Summ. J. 1, 5, 6–8. The Trustee submits that he has the rights of a holder in due

course by virtue of the assignment from Wallkill, and may also rely on the estoppel certificates.

*Id.* Additionally, the Trustee contends he may rely on the estoppel certificates as the

representative of Ms. Barnett's bankruptcy estate. *Id.* at 6. The Trustee argues that, as a result,

Gellatly is prohibited from asserting any defenses to payment. *Id.* at 10. The Court finds that

even though the Trustee does not have holder in due course status, the Trustee may seek to rely

on the estoppel certificates with regard to any of the defenses that arose prior to May 27, 2011.

Due to a defect in the negotiability of the Notes, the Trustee cannot be a holder or a

holder in due course. Under the New York Uniform Commercial Code § 1-201(b)(21)(A), a

holder is "the person in possession of a negotiable instrument that is payable either to bearer or

to an identified person that is the person in possession . . . ." To be a holder, the note must first

be negotiable. Here, as previously discussed by the Court, the Notes are not made payable to

Ms. Barnett's order and, accordingly, are not negotiable. *See* Reply Mem. 4; Tillem Decl. Exs.

F-1–F-5. This means that neither Wallkill nor the Trustee, as the assignee of Wallkill's security

interest, can be holders of the Notes, and may not enforce payment as holders under New York

law. N.Y. U.C.C. § 3-301 ("The holder of an instrument whether or not he is the owner may

transfer or negotiate it and, except as otherwise provided in Section 3-603 on payment or

satisfaction, discharge it or enforce payment in his own name."). Being a holder is a prerequisite

to obtaining holder in due course status. *See* N.Y. U.C.C. § 3-302(1). As a result, the Trustee is

not a holder in due course.

The Trustee claims he may rely on the estoppel certificates either as the representative of

Ms. Barnett's bankruptcy estate, *i.e.*, as Ms. Barnett, or as an innocent assignee who took

Wallkill's security interest in the Notes. In New York, "the general rule is that an assignee

acquires no greater rights than his assignor . . . ." *Chem. Bank N.Y. Trust Co. v. Blane's, Inc.*,

239 N.Y.S.2d 758, 760 (N.Y. Civ. Ct. 1962); *see also BNP Paribas Mortg. Corp.*, 949 F. Supp.

2d at 502 (quoting *Squire v. Greene*, 52 N.Y.S. 1013, 1017–18 (N.Y. App. Div. 1898)); *Beck v.

Sheldon*, 181 N.E. 360, 361 (N.Y. 1932); *Kommel v. Herb-Gner Constr. Co.*, 176 N.E. 413, 415

(N.Y. 1931).

On the other hand, where there is an estoppel certificate "[t]he assignee's right of

recovery does not depend upon the title or interest of his assignor, but upon the [obligated

party's] representation by his certificate or by his conduct that the [debt] is valid and existing."

*Hammelburger v. Foursome Inn Corp.*, 431 N.E.2d 278, 282 (N.Y. 1981) (citations omitted).

The "estoppel certificate bars the person who executes it and anyone in privity of estate with him

from interposing an otherwise valid defense to the" debt. *Cent. Fed. Sav. F.S.B. v. Laurels

Sullivan Cty. Estates Corp.*, 537 N.Y.S.2d 642, 644 (N.Y. App. Div. 1989).

The party seeking to enforce the estoppel certificate has the burden to show that the party

to be estopped "made representations in the certificate contrary to those it asserts here, that

defendant intended such representations be acted upon, that plaintiff detrimentally relied upon those representations, and that defendant at least had constructive, if not actual, knowledge of the true state of affairs." *JRK Franklin, LLC v. 164 E. 87th St. LLC*, 812 N.Y.S.2d 506, 507 (N.Y. App. Div. 2006) (citing *Health–Loom Corp. v. Soho Plaza Corp.*, 709 N.Y.S.2d 165, 167 (N.Y. App. Div. 2000)); *see also Cent. Fed. Sav. F.S.B.*, 537 N.Y.S.2d at 645 (citations omitted). Once this showing is made, the burden shifts to "the certifying party [to] show a defense to the making of the document, such as fraud or duress, or that the assignee accepted the certificate with knowledge of the contrary, and true, state of the facts." *JRK Franklin*, 812 N.Y.S.2d at 507 (citing *Hammelburger*, 431 N.E.2d at 282).

Here, the first element required to apply the estoppel certificates is a contrary state of facts alleged to the Court. In the first five estoppel certificates, Gellatly certified that the Notes are "due and payable in the original principal amount and that there are no defenses or offsets . . . ." *See, e.g.*, Tillem Decl. Summ. J. Ex. G-1. On May 27, 2011, Gellatly executed a sixth estoppel certificate. Tillem Decl. Summ. J. Ex.G-6. Even though the sixth estoppel certificate was executed after the Debtors entered into the Commercial Note with Wallkill, it provides another promise that Gellatly "is justly indebted to [Ms. Barnett] in the amount of $2,253,794.00 pursuant to the terms of the Notes as amended and as further amended and that [Gellatly] has no offsets or defenses to the debt evidence by the Notes . . . ." *Id.* Any contention that Ms. Barnett breached the contract prior to May 27, 2011 is contrary to that representation.

Gellatly expressly invited reliance on his statement that he had no defenses to payment by both Ms. Barnett and any subsequent assignees. Gellatly executed and signed the first five estoppel certificates on May 16, 2011, just two days before Debtors entered into the Commercial Note with Wallkill. Def.'s SMF ¶ 6. Each certificate recited that Gellatly

> makes this covenant and declaration not only for the benefit of the holder of
> the . . . Note, but for the benefit of any subsequent holder of said Note, the
> undersigned intending that such subsequent holder or assignee shall rely upon this
> covenant and declaration in accepting an assignment of said . . . Note.

*Id.* The first five estoppel certificates specifically contemplate reliance by subsequent holders or

assignees. *See, e.g.*, Tillem Decl. Summ. J. Ex. G-1. After the Debtors executed the

Commercial Note with Wallkill on May 18, 2011, Gellatly and Ms. Barnett agreed to modify the

amount due and owing on the Notes. Answer Exs. 17–19. The sixth estoppel certificate was

made in recognition of this changed amount, and reaffirmed Gellatly's promise that there were

still no defenses to the debt. Tillem Decl. Summ. J. Ex.G-6. The sixth certificate also avers that

Gellatly "makes this covenant and declaration not only vfor [sic] the benefit of the holder of the

Notes, butr [sic] for the benefit of any subsequent holder of the Notes or any of them . . . ."

Tillem Decl. Summ. J. Ex.G-6. The sixth estoppel certificate states any subsequent holder or

"any of them" is entitled to rely on Gellatly's affirmation that he had no defenses or offsets to the

debt. Tillem Decl. Summ. J. Ex. G-6. Gellatly certified not only to Ms. Barnett that he was

justly indebted to her, he also made this representation for the benefit of any assignee. Tillem

Decl. Summ. J. Exs. G-1–G-6. Gellatly waived his defenses directly to Ms. Barnett with the

intention that any assignee would be justified in relying on this representation.

Further, both Ms. Barnett and Wallkill justifiably relied on Gellatly's warranties to their

detriment. The Trustee avers that the estoppel certificates were an integral part of Wallkill's

decision to extend financing to the Debtors. Reply Mem. 6. The Trustee states Wallkill decided

to loan the Debtors $500,000 based on Gellatly's financial assurances. *Id.* at 6 (citing Reply Aff.

of Horodyski, ¶¶ 4–7, Sept. 15, 2015, ECF No. 57). Even though the sixth estoppel certificate

was executed after Wallkill decided to enter into the Commercial Note with the Debtors, it

echoes and reaffirms the sentiments of the first five estoppel certificates. *See* Tillem Decl.

Summ. J. Exs. G–1–G–6. It does not change the fact that Wallkill relied, to its detriment, on

Gellatly's affirmation that he had no defenses to payment on the Notes. Wallkill extended

financing to Ms. Barnett based on Gellatly's Notes and is expecting payment from Gellatly now

that Ms. Barnett has defaulted. Similarly, Ms. Barnett relied on Gellatly's promises to pay

Wallkill in her stead.

Having established all but one of the requirements for estoppel, the Trustee need only

show that Gellatly had knowledge of the contrary state of facts at the time he signed the estoppel

certificates. Gellatly could not have had knowledge of any defenses that arose after he signed

the estoppel certificates. Thus, the Court finds as a threshold matter, that the estoppel certificates

cannot bar any defenses that arose after Gellatly executed the sixth estoppel certificate.

According to the terms of the sixth estoppel certificate, Gellatly certified that as of May 27,

2011, he was justly indebted to Ms. Barnett for the amount stated therein. Tillem Decl. Summ. J.

Ex. G-6. Any defenses to payment that arose after Gellatly signed the estoppel certificates were

not included in the certificate's representations or promises. Gellatly could not have waived

defenses that did not exist as of the time he made that certification. Accordingly, the estoppel

certificates do not bar any defenses to payment that arose after May 27, 2011. For all defenses

allegedly arising after May 27, 2011, the Court will evaluate on a case-by-case basis whether

Gellatly had actual or constructive knowledge of the contrary facts.

In opposition, Gellatly argues the estoppel certificates should not apply at all, and that all

of his defenses should be considered. Gellatly first baldly concludes the estoppel certificates

were executed under duress. Def.'s Mem. in Opp'n 15. Gellatly has offered no legal argument

on this point, nor has he offered any evidence in support. *See id.* As such, Gellatly has not made

a sufficient showing of duress.

In addition to duress, Gellatly contends the Trustee did not take the security interests for value and that the Trustee had knowledge of the actual state of affairs at the time he took the assignment from Wallkill. Gellatly argues that, as a result, the estoppel certificates should not apply. The Court finds that neither of these arguments are meritorious.

As stated previously, the Trustee gave value in exchange for the Agreement with Wallkill. In the Agreement, the Trustee stated "that Wallkill has a valid and enforceable security interest in the . . . Notes," acknowledged "a Total Due to Wallkill under the Commercial Note in the sum of $463,913.10," and promised "to enforce the . . . Notes at the expense of the estate . . . ." Tillem Decl. Summ. J. Ex. A, at 13. The Trustee further agreed to grant Wallkill a first priority security interest in the Notes and to pay Wallkill first "from any and all sums recovered on the" Notes. *Id.* The Trustee's agreement to pay Wallkill out of the recovery from this litigation is money the Trustee would otherwise have been entitled to claim as property of the estate. *See* 11 U.S.C. § 541(a)(7). As for whether or not the Trustee had knowledge of Gellatly's defenses, the sole piece of evidence before the Court is the fact that the Trustee took the assignment from Wallkill after the Notes were overdue. Tillem Decl. Summ. J. Ex. A; Ex. B; Exs. F-1–F-5. This is only evidence that Gellatly had not paid on the Notes when they matured. Gellatly's failure to pay on time does not give the Trustee knowledge of the circumstances that gave rise to Gellatly's defenses to payment on the contract.

## VI. DEFENSES

### A.    Highland and Retail Center Notes

Gellatly contends that the Highland Note and the Retail Center Note are null and void due to a condition precedent contained in paragraph 2.11 of both Purchase Agreements. Def.'s Mem. in Opp'n at 15. Paragraph 2.11 of the Highland Purchase Agreement states Highland

intended to obtain a mortgage guaranteed by the United States Department of Housing and Urban Development ("HUD") to finance the construction of an assisted living facility. DuVall Aff. in Opp'n Ex. 2-4, at ¶ 2.11. Similarly, the Retail Center Purchase Agreement sets forth Retail Center's intention to obtain a loan to construct a commercial plaza. *Id.* at Ex. 2-5, at ¶ 2.11. The Trustee has admitted that as the Highland Note and the Retail Center Note "appear to contain conditions precedent that were not met, recovery on those two Notes is unlikely." Reply Mem. 1 (footnote omitted). The Trustee's Reply abandons his effort to recover on the Highland and Retail Center Notes on summary judgment. Accordingly, summary judgment on the Highland and Retail Center Notes is denied.

## B.    Wappinger Gardens Note

### 1. Condition Precedent

Gellatly contends that the Wappinger Gardens Note is null and void due to the condition precedent contained in paragraph 2.11 of the Purchase Agreement. Def.'s Mem. in Opp'n at 15. In paragraph 2.11 of the Wappinger Gardens Purchase Agreement, Wappinger Gardens states its intention to obtain a $75,000,000 loan for the construction of an assisted living facility and senior housing facility. DuVall Aff. in Opp'n Ex. 2-1, at ¶ 2.11. Paragraph 2.11 provides that "[i]n the event that a mortgage commitment guaranteed by HUD is not obtained by the Company on or before November 30, 2012 then this Agreement shall be deemed null and void and the initial deposit set forth in paragraph 1.2(i) hereof shall be returned to the Purchaser." *Id.* Gellatly argues the mortgage was never obtained and according to paragraph 2.11's condition precedent, the Note is void. Def.'s Mem. in Opp'n 15 (citing DuVall Aff. in Opp'n Ex. 3).

The Court finds the estoppel certificates do not bar Gellatly's claim that the Wappinger Gardens Note is null and void due to the condition precedent in paragraph 2.11. Under the

Wappinger Gardens Purchase Agreement, Wappinger Gardens had until November 30, 2012 to

obtain a mortgage from HUD. DuVall Aff. in Opp'n Ex. 2-1, at ¶ 2.11. When Gellatly executed

the final estoppel certificate on May 27, 2011, the failure of the condition precedent in paragraph

2.11 had not occurred. *See* Tillem Decl. Summ. J. Exs. F-1–F-6. Equitable estoppel requires an

act constituting concealment or misrepresentation, and actual or constructive knowledge of the

true state of affairs. *See Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 90

(2d Cir. 2013) (quoting *Gen. Elec. Capital Corp. v. Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir.

1994)). Gellatly could not have agreed to waive a defense based on facts and circumstances that

did not yet exist. As a result, the Court concludes that the estoppel certificates cannot bar

Gellatly's defense based on the failure of the condition precedent in paragraph 2.11.

Although the Trustee conceded that the Highland Note and the Retail Center Note were

likely void, the Trustee does not concede that the Wappinger Gardens Note is similarly

unenforceable. Reply Mem. 16. The Trustee does not dispute that Ms. Barnett did not obtain the

financing required by the Wappinger Gardens Note. Reply Mem. 1. Instead, the Trustee asserts

that Ms. Barnett and Gellatly executed an amendment to the Purchase Agreement on May 27,

2011, eliminating paragraph 2.11 and the condition precedent. *Id.* at 16 (citing Reply Decl.

David L. Tillem Further Supp. Summ. J. ("Tillem Decl. Reply") Ex. D, Sept. 15, 2015, ECF No.

56). On May 27, 2011, Ms. Barnett and Gellatly executed an agreement negotiating the

exchange of membership shares in Vineyard Commons and Wappinger Gardens. Answer Ex.

16. In the agreement, the parties agreed to eliminate the condition precedent in paragraph 2.11 in

the Wappinger Gardens Purchase Agreement. *Id.* at ¶ 3. The Trustee's Reply and Gellatly's

Answer include a copy of an Amended Purchase Agreement, executed on May 27, 2011, which

also states the condition was eliminated. *Id.* at Ex. 18; Tillem Decl. Reply Ex. P. Based on the

evidence before the Court, the Wappinger Gardens Note was amended to strike the condition

precedent from the Purchase Agreement.    As there was no condition precedent in the Wappinger

Gardens Note, Gellaty's argument fails.

### 2. Duly Organized and In Good Standing

Gellatly also opposes summary judgment based on his defense that Wappinger Gardens

was not duly organized or in good standing, as required in paragraph 2.1 of the Purchase

Agreement.  *See* Def.'s Mem. in Opp'n 15; DuVall Aff. in Opp'n Ex. 2-1, at ¶ 2.1.  Paragraph

2.1 represents that "Wappinger is an organization duly organized, validly existing and in good

standing under the laws of the State of New York, Wappinger has full power and authority to

own property and to carry on business as it is now being conducted."  DuVall Aff. in Opp'n Ex.

2-1, at ¶ 2.1.  In support of this defense, Gellatly offers Mr. Barnett's indictment by the U.S.

Attorney's Office for fraudulent activities in relation to Vineyard Commons as evidence "that the

LLCs may not have been operating lawfully."  Def.'s Mem. in Opp'n 15.  Despite Gellatly's

attempt to use Mr. Barnett's indictment as evidence of an ongoing breach of paragraph 2.1, the

representations made in that paragraph were not future promises of performance.

The Court finds that the estoppel certificates bar Gellatly's assertion that Wappinger

Gardens was not duly organized or in good standing in violation of paragraph 2.1.  The

Wappinger Gardens Purchase Agreement was executed on September 17, 2010.  DuVall Aff. in

Opp'n Ex. 2-1.  Gellatly executed the sixth estoppel certificate on May 27, 2011.  Tillem Decl.

Summ. J. Ex.G-6.  The Purchase Agreement represented that at the time of sale, Wappinger

Gardens was duly organized and in good standing under the laws of New York.  DuVall Aff. in

Opp'n Ex. 2-1, at ¶ 2.1.  The language is written in the present tense.  *Id.*  It warrants that at the

time, Wappinger Gardens had the power to "carry on business as it is now being conducted."  *Id.*

The statement does not make any promises about future business.  It is not a guaranty by Ms.

Barnett that Wappinger Gardens will exist in perpetuity.  It is a representation as to the existing

state of affairs of Wappinger Gardens at the time Gellatly executed the Purchase Agreement.  It

was a representation made to induce Gellatly to enter into the Purchase Agreement.  As such,

Gellatly waived this defense to the contract based on this alleged breach when he executed the

sixth estoppel certificate on May 27, 2011.

### 3. Adequate Capitalization

Gellatly next argues that Ms. Barnett did not adequately capitalize Wappinger Gardens,

in breach of the Wappinger Gardens Purchase Agreement.  Def.'s Mem. in Opp'n 21.  Paragraph

2.2 of the Wappinger Gardens Purchase Agreement states that "[t]he authorized capital of

Wappinger consists of the membership interests which are issued and outstanding on the date

hereof as set forth in the Operating Agreement."  DuVall Aff. in Opp'n Ex. 2-1, at ¶ 2.2.  The

Operating Agreement for Wappinger Gardens provides that "[w]ithin eight (8) months from the

execution of this Agreement, each of the Members will make the following Capital

Contributions," including a $1,000,000 contribution from Ms. Barnett.  DuVall Aff. in Opp'n Ex.

5-3, at ¶ 7.1.  The Operating Agreement has an effective date of January 1, 2010.  *See id.* at 1.

The Operating Agreement further provides that

> [t]he Managers may determine, from time to time, that capital, in addition to the
> Primary Capital Contributions, is required by the Company.  If the Managers
> make such determination and the Members holding the requisite percentage of
> Membership Interests approve of such decision as required in Section **Section 4.4**,
> above, all Members shall be obligated to make additional Capital
> Contributions . . . as required on a pro rata basis based on their respective
> Membership Interests.

*Id.* at ¶ 7.2(b).  To the extent Gellatly may be arguing that Ms. Barnett did not make the initial

$1,000,000 contribution, that breach would have occurred by August, 2010.  When Gellatly

signed the estoppel certificate on May 27, 2011, he waived any defense based on breach of this provision.

As for the continuing need for capital contributions, Gellatly argues Wappinger Gardens did not have adequate funding, in part due to the Debtors' decision to improperly allocate funds to other real estate companies, including Vineyard Commons. Def.'s Mem. in Opp'n 17; Gellatly Aff. ¶ 15, Aug. 6, 2015, ECF No. 50. Gellatly claims that he and other investors were subject to cash calls in early 2011 and that at that time he "had not yet learned the extent of the fraud and misrepresentation that was being practiced" by the Debtors. Gellatly Aff. ¶ 12.

In support, Gellatly offers a letter from another member of Wappinger Gardens to Ms. Barnett. DuVall Aff. in Opp'n Ex. 7. The letter, dated May 4, 2011, expresses the author's anger that proceeds from a particular loan were being improperly diverted from Wappinger Gardens, to Vineyard Commons. *Id.* Gellatly states that he was similarly subject to cash calls by the Debtors, and directed to make checks out to Ms. Barnett on behalf of Vineyard Commons. Def.'s Mem. in Opp'n 17 (citing DuVall Aff. Ex. 8). Gellatly claims he later found out that the Debtors "were treating the funds that they had borrowed from institutional lenders, as well as cash which had been invested by the investor group as their personal monopoly money . . . ." Gellatly Aff. ¶ 14. The Trustee responds that Gellatly negotiated to take over Wappinger Gardens about the same time he executed the sixth estoppel certificate, in May, 2011. Reply Mem. 16; *see also* Answer Countercls., at ¶¶ 23–24. The Trustee claims that Gellatly was in charge of Wappinger Gardens at the time it failed. Reply Mem. 16.

Gellatly's arguments here do not sound in breach of contract against Ms. Barnett. There is no argument that Wappinger's authorized capital did not consist of the outstanding membership interests, or that Ms. Barnett had not contributed the $1,000,000 amount required by

the Purchase Agreement.  Gellatly's argument is a general allegation that Ms. Barnett breached

her fiduciary duties to the real estate companies she partly owned and managed.  Gellatly asserts

that both Debtors mismanaged the companies and treated corporate funds as their own, "having

no regard for their duties to the group and to the lenders."  Gellatly Aff. ¶ 14.  Assuming that this

argument would not be barred by the estoppel certificates, Gellatly has not made any effort to

show that he has standing to assert this claim in his personal capacity against either of the

Debtors, in their personal capacities.

   Where an officer of a corporation mismanages corporate assets in breach of her fiduciary

duty, that duty is generally owed to the corporation.  *See, e.g.*, *In re Stillwater Capital Partners*

*Inc. Litig.*, 851 F. Supp. 2d 556, 571 (S.D.N.Y. 2012); *Tele–Consult Assocs., Inc. v. Clark (In re*

*Clark)*, 2009 WL 3366973, at *2 (Bankr. D. Conn. Oct. 16, 2009).  In this situation, a

shareholder must establish his derivative standing to sue on behalf of the corporation.  *In re*

*Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 379 (S.D.N.Y.) *on reconsideration in part,* 813 F.

Supp. 2d 383 (S.D.N.Y. 2011).  Gellatly has not addressed the issue either way.  The Court finds

that Gellatly has not met his burden to offer evidence sufficient to overcome summary judgment

on the Wappinger Gardens Note based on general arguments of mismanagement.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).

As such, the Court finds that Gellatly has not presented a genuine issue of material fact regarding

the Wappinger Gardens Note and summary judgment is granted to the Trustee on this Note.

**C.**  **DJ Orchard Note**

   **1. Duly Organized and In Good Standing**

Gellatly argues that DJ Orchard was not duly organized or in good standing, in breach of paragraph 2.1 of the DJ Orchard Purchase Agreement.  Paragraph 2.1 of the DJ Orchard Purchase Agreement promises that

> [t]he Company and Orchard are each an organization duly organized, validly existing and in good standing under the laws of the State of New York, and each has full power and authority to own its property and to carry on its business as it is now being conducted.  True, accurate and complete copies of the Articles of Organization and the Operating Agreements of the Company are attached hereto collectively as Exhibit "C" and the Articles of Organization and Operating Agreement of Orchard are attached hereto as Exhibit "D".

DuVall Aff. in Opp'n Ex. 2-2, at ¶ 2.1.  For the same reasons that the estoppel certificate bars this defense to payment on the Wappinger Note, it is also barred with regard to the DJ Orchard Note.  The statement that DJ Orchard was duly organized and in good standing was a representation as to DJ Orchard's circumstances at the time Gellatly executed the Purchase Agreements.  It was not a guarantee of things to come.  Gellatly waived any defenses he had based on a violation of this paragraph at the time he signed the sixth estoppel certificate on May 27, 2011.  Even if Gellatly had not waived this defense, the DJ Orchard Operating Agreement includes a certificate of good standing in Exhibit C.  DuVall Aff. in Opp'n Ex. 5-4, at 27.

### 2. Adequate Capitalization

Gellatly also argues that DJ Orchard was not adequately capitalized, in violation of paragraph 2.2 of the DJ Orchard Purchase Agreement.  Def.'s Mem. in Opp'n 15–17.  Paragraph 2.2 of the DJ Orchard Purchase Agreement states that "[t]he authorized capital of the Company and Orchard consists of the membership interests which are issued and outstanding on the date hereof as set forth in the Operating Agreements."  DuVall Aff. in Opp'n Exs. 2-2, at ¶ 2.2.  The DJ Orchard Operating Agreement states that "[e]ach of the Members shall contribute to the capital of the Limited Liabiilty Company the amount set forth opposite his name below," and

then lists Ms. Barnett as owing $100,000. *Id.* at Ex. 5-4, at ¶ 6. The Operating Agreement further provides that "Members shall contribute to the capital of the Company from time to time at the request of the holders of the majority of the Member's Interest and in proportion to their respective percentage Membership Interests in the Company . . . ." *Id.* Gellatly does not set forth any evidence particular to DJ Orchard to show DJ Orchard was not adequately capitalized in violation of paragraph 2.2. As such, even if the estoppel certificates did not apply, Gellatly has not met his burden to come forward with admissible evidence to show a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247–48.

### 3. Improper Transfer of Membership

Gellatly next argues that Ms. Barnett improperly sold him her interests in "Orchard" in contravention of paragraph 2.9 of the Purchase Agreement. Def.'s Mem. in Opp'n 18. Gellatly maintains that, in fact, "Orchard" had signed a Regulatory Agreement for Multifamily Housing Projects with HUD that required HUD approval for any transfer of ownership interests. *Id.* Gellatly provides a letter, dated September 17, 2013, from HUD regarding both Vineyard Commons and Orchard Hills. DuVall Aff. in Opp'n Ex. 9. The letter states that, in fact, "Orchard Hills is in the process of changing their ownership however, it has not been approved as of yet. In addition, this office did not grant any party with permission to sell shares in both projects." *Id.*

The Trustee responds that no such approval was required for a transfer of interests in DJ Orchard. Reply Mem. 13–14. The Trustee claims the HUD agreement only requires approval in the event of a change of ownership and control of Orchard Hills of Newburgh, LLC ("Orchard Hills"), not DJ Orchard. *Id.* at 13–14. The Trustee alleges that "DJ Orchard is merely a member of the Owner," *i.e.*, Orchard Hills. *Id.* at 14. The Trustee contends that Gellatly has not shown

Ms. Barnett "transferred her interest as a managing member of DJ Orchard to Gellatly," due to the fact Gellatly only purchased a 14% interest in DJ Orchard. *Id.* (citing DuVall Aff. in Opp'n Ex. 2-2). The Trustee further claims that the HUD letter proffered by Gellatly only provides the answer to an unknown question, and does not establish any transfer of interest in Orchard Hills sufficient to require HUD approval. *Id.*

> The DJ Orchard Purchase Agreement explains that
>
> the Seller is the holder of a 38.75 percent membership interest in DJ ORCHARD, LLC, a New York limited liability company (sometimes hereinafter the "Company"), which Company owns 90% of the membership interests in Orchard Hills of Newburgh, LLC, a New York limited liability company ("Orchard"), and the Seller desires, subject to the terms and conditions herein contained, to sell, transfer and. Assign to Purchaser a 14 percent interest in the Company . . . .

DuVall Aff. in Opp'n Ex. 2-2, at 1. Ms. Barnett warranted in the DJ Orchard Purchase Agreement that "[n]o other authorization is necessary on the part of the Company or Orchard for the consummation of the transactions contemplated by this Agreement, other than the written consent of all the members of the Company." *Id.* at ¶ 2.3. Ms. Barnett also represented that "[n]o provision of the Articles of Organization or the Operating Agreement of the Company or Orchard or any agreement or instrument to which the Seller, the Company or Orchard is a party or by which they are bound will be violated by the execution and delivery by the Seller of this Agreement . . . ." *Id.* at ¶ 2.4. Paragraph 2.9 of the DJ Orchard Purchase Agreement states that

> [n]one of the execution and delivery by the Seller of this Agreement the consummation of the transactions contemplated hereby, or compliance by the Seller with any of the provisions hereof will (i) conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, (A) any charter documents of the Company or Orchard, (B) any contract, permit or license to which the Seller, the Company or Orchard is a party or by which they or the Purchased Interest is bound . . . .

*Id.* at ¶ 2.9.

The DJ Orchard Operating Agreement does not overtly require approval from HUD for a transfer of membership interests. The Operating Agreement does require consent of two-thirds of the other members. DuVall Aff. in Opp'n Ex. 5-4, at 13–14. There does not appear to be a section devoted to HUD approval. *See generally id.* Despite the fact the DJ Orchard Operating Agreement does not explicitly require regulatory approval for a transfer of interest, the Regulatory Agreement for Multifamily Housing Projects ("Regulatory Agreement") executed by Orchard Hills and HUD, states that

> Owners shall not without the prior written approval of [HUD] . . . Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property.

Answer Ex. 8, at ¶ 6. The term "Owners" is defined therein to include "Orchard Hills of Newburgh, LLC and all present and future members and managing members thereof." *Id.* at ¶ 17. Exhibit D to the DJ Orchard Operating Agreement, a written consent of the members of DJ Orchard, states that "[DJ Orchard] is the manager of Orchard Hills of Newburgh, LLC . . . ." DuVall Aff. in Opp'n Ex. 5-4, at 29. The consent agreement further summarizes that "the Operating Agreement of [DJ Orchard] provides that [Ms. Barnett] is the sole manager of [DJ Orchard], the Operating Agreement of [Orchard Hills] provides that Denise Barnett is an "Official Representative" of [Orchard Hills] for all HUD matters . . . ." *Id.*

The Court finds that Gellatly's defense is not barred by the estoppel certificates. Gellatly argues that at the time he signed the Purchase Agreements, he was not aware "Orchard" had executed any such agreement. Def.'s Mem. in Opp'n 18; Answer Countercls., at ¶ 9. The Trustee does not allege that Gellatly did, in fact, know about any potential HUD requirement. Instead, the Trustee replies that "Gellatly is wrong as no such consent was required." Reply Mem. 13. As explained, the provision requiring HUD approval for transfer of membership

interests is not contained in or attached to the Purchase Agreement or the DJ Orchard Operating

Agreement.  *See* DuVall Aff. in Opp'n Exs. 2-2, 5-4.

Based on the record before the Court, the requirement was contained in the separate

Regulatory Agreement executed between Orchard Hills and HUD.  Answer Ex. 8.  Gellatly

provides the Court with a letter from HUD dated September 17, 2013.  DuVall Aff. in Opp'n Ex.

9.  The letter states it "is in response to [Gellatly's] letter dated July 29, 2013, in reference to

questions regarding the ownership of Vineyard Commons and Orchard Hills."  *Id.*  The letter

corroborates Gellatly's claim that he did not have actual knowledge of the circumstances when

he signed the sixth estoppel certificate on May 27, 2011, over two years earlier.  As the Trustee

does not allege Gellatly had knowledge at the time he executed the sixth estoppel certificate, nor

controvert Gellatly's argument that he was unaware of the requirement at the time he executed

the estoppel certificates, the Court finds the Trustee has not met his prima facie burden to

establish that the estoppel certificates should apply here.

Gellatly has proffered sufficient evidence to show a disputed issue of material fact

regarding whether Ms. Barnett breached the Purchase Agreement by conveying membership

interests she may not have had the right to transfer.  On its face, the definition of "Owners" in the

Regulatory Agreement includes members and managing members of Orchard Hills.  Answer Ex.

8, at ¶ 17.  The consent agreement attached to the DJ Orchard Operating Agreement provides

that DJ Orchard managed Orchard Hills.  DuVall Aff. in Opp'n Ex. 5-4, at 29.  The Purchase

Agreement itself states that DJ Orchard owns 90% of the membership interests in Orchard Hills.

*Id.* at Ex. 2-2.  Further, Ms. Barnett is the sole manager of DJ Orchard and is the Official

Representative of Orchard Hills for HUD matters.  The Court concludes that membership

interests in DJ Orchard are included in the definition of "Owners" in the Regulatory Agreement.

Despite the Trustee's claims that regulatory approval is only triggered upon the transfer of a controlling interest, Reply Mem. 13–14, the Regulatory Agreement states that the owner shall not convey "any right to manage or receive the rents and profits from the mortgage property." Answer Ex. 8, at ¶ 6. Gellatly purchased a 14% ownership interest of Ms. Barnett's membership interest in DJ Orchard. DuVall Aff. in Opp'n Ex. 2-2. As an incident of ownership, Gellatly purchased some right to manage or profit from DJ Orchard. The question to be resolved at trial is whether Gellatly had any right to manage Orchard Hills, or received any profits or rent from the mortgage property owned by Orchard Hills due to his 14% ownership of DJ Orchard, in violation of the Regulatory Agreement.

## D.    Vineyard Commons Note

### 1. Duly Organized and In Good Standing

Gellatly asserts that Vineyard Commons was not duly organized or in good standing, as required in paragraph 2.1 of the Purchase Agreement. *See* Def.'s Mem. in Opp'n 15. Paragraph 2.1 of the Vineyard Commons Purchase Agreement represents that "VCH's an organization duly organized, validly existing and in good standing under the laws of the State of New York, VCH has full power and authority to own property and, to carry on business as it is now being conducted." DuVall Aff. in Opp'n Ex. 2-3, at ¶ 2.1. As stated for both Wappinger Gardens and DJ Orchard, the representations were not made as a continuing guarantee of circumstances. Gellatly executed the sixth estoppel certificate in May 27, 2011, after the Purchase Agreement was executed. Tillem Decl. Summ. J. Ex. G-6. As such, the estoppel certificate bars this defense to payment.

### 2. Adequate Capitalization

Gellatly also argues that Vineyard Commons was not adequately capitalized, in breach of the Purchase Agreement's representation in paragraph 2.2. Def.'s Mem. in Opp'n 15. Paragraph 2.2 of the Vineyard Commons Purchase Agreement states that "[t]he authorized capital of [Vineyard Commons] consists of the membership interests which are issued and outstanding on the date hereof as set forth in the Operating Agreement." DuVall Aff. in Opp'n Ex. 2-2, at ¶ 2.2. In support, Gellatly offers a copy of a check he wrote to Ms. Barnett for $90,306 on February 7, 2011, allegedly for the benefit of Vineyard Commons. Def.'s Mem. in Opp'n 17; DuVall Aff. in Opp'n Ex. 8. Gellatly claims that Mr. Barnett forced Gellatly to execute the check and to make it out to Ms. Barnett, threatening that otherwise Gellatly's interest in Vineyard Commons would be diluted. Gellatly Aff. ¶ 12. To the extent the check is evidence that Vineyard Commons needed more capital, the check was issued on February 7, 2011 prior to the sixth estoppel certificate. Without more, the defense that Vineyard Commons was not adequately capitalized is estopped.

Even if the estoppel certificates did not preclude this defense, the record before the Court does not appear to contain the Vineyard Commons Operating Agreement. *See* DuVall Aff. in Opp'n 14–17. As a result, the Court cannot state with any certainty what capitalization requirements the Vineyard Commons Operating Agreement may contain.[9]

### 3. Fraud and Misrepresentation

In Gellatly's affidavit, he accuses the Debtors of fraud and misrepresentation regarding Vineyard Commons.[10] Gellatly Aff. ¶ 12. Gellatly claims he was fraudulently induced to write

---

[9] Gellatly claims that further discovery is warranted. Def.'s Mem. in Opp'n 21. Discovery closed on June 30, 2015. *See* Scheduling Order, Jan. 1, 2015, ECF No. 16. There is no formal affidavit or declaration, as required by Federal Rule of Bankruptcy Procedure 7056(d), requesting the court to reopen discovery at this time.

[10] To the extent Gellatly's arguments could be construed as allegations of mismanagement, the court has already found that Gellatly did not address any of the required elements of standing and, as such, has not met his burden to defeat a motion for summary judgment on this claim.

a check for Vineyard Commons and required to make it out to Ms. Barnett.  Gellatly also points

to the indictment by the U.S. Attorney's Office of Mr. Barnett for fraudulent activities in relation

to Vineyard Commons.  Def.'s Mem. in Opp'n 20 (citing DuVall Aff. in Opp'n Ex. 4).

Assuming for the sake of argument that the estoppel certificates do not bar this defense, Gellatly

has not made out a legal claim for fraud or misrepresentation.  In New York, an action for fraud

requires "a false representation of material fact, knowledge by the party who made the

representation that it was false when made, justifiable reliance by the plaintiff, and resulting

injury."  *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006) (citations omitted).  "Under New

York law, each element of a fraud claim must be proven by clear and convincing evidence."

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 784-85 (2d Cir. 2003) (citations omitted).

There is no argument before the Court addressing the elements of fraud, nor is there a contention

that Gellatly has adequately established fraud.[11]  Further, the indictment is only evidence that an

indictment against Mr. Barnett has been filed.  *See* Fed. R. Evid. 801.  It is not admissible to

show the proof or falsity of the allegations made therein.  *See In re WorldCom, Inc. Sec. Litig.*,

2005 WL 375315, at *9 (S.D.N.Y. Feb. 17, 2005) ("The indictments are not admissible

evidence. . . They are hearsay, since the only purpose is to offer the documents for the truth of

the statements contained in them.").  As such, Gellatly has not created a genuine dispute of

material fact sufficient to deny summary judgment on these grounds.

### 4. Improper Transfer of Membership

---

[11] Although this is not a motion to dismiss, the Court notes that Federal Rule of Civil Procedure 9(b), incorporated
and made applicable here by Federal Rule of Bankruptcy Procedure 7009, requires the party alleging fraud to "state
with particularity the circumstances constituting fraud or mistake."  Even though state of mind need only be plead
generally, a plaintiff "must still allege facts that give rise to a strong inference of scienter . . . ."  *In re LIBOR-Based
Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 468 (S.D.N.Y. 2014) (citations omitted) (internal quotation
marks omitted).

Gellatly also argues that Ms. Barnett sold him her membership interest in Vineyard Commons in contravention of paragraph 2.9 of the Purchase Agreement.  Def.'s Mem. in Opp'n 18.  Gellatly makes the same argument here as it did for DJ Orchard, namely that Ms. Barnett, on behalf of Vineyard Commons, executed a Regulatory Agreement with HUD that required HUD approval prior to the transfer of any beneficial ownership interest.  Def.'s Mem. in Opp'n 18.

Here, the Vineyard Commons Operating Agreement is not before the Court.  As such, the Court cannot verify whether Gellatly would have been on notice that HUD approval was or was not required for a transfer of ownership at the time he signed the Purchase Agreement.  Despite the lack of corroborating evidence, the Court concludes that the estoppel certificates should not apply.  The Trustee has not established Gellatly had knowledge of the alleged contrary state of facts.

Gellatly also argues he was not aware Ms. Barnett executed a Regulatory Agreement with HUD when he signed the Vineyard Commons Purchase Agreement.  *Id.*  Again, the Trustee does not allege Gellatly had knowledge of the Regulatory Agreement prior to executing the estoppel certificates, or that the terms of the Vineyard Commons Operating Agreement put Gellatly on notice.  Reply Mem. 13, 18.  Additionally, there is no argument that Vineyard Commons did not execute the Regulatory Agreement, or that it is not bound by those terms.  *Id.* at 18 n.7.  As the burden is on the Trustee to establish that Gellatly had knowledge of the contrary state of facts at the time he executed the estoppel certificates, the Court finds Gellatly is not estopped from bringing this defense.

In the Vineyard Commons Purchase Agreement, Ms. Barnett warranted  that "[n]o other authorization is necessary on the part of the Seller for the consummation of the transactions contemplated by this Agreement," and that she had "all requisite power, authority, right and legal

capacity to execute and deliver this Agreement, fully perform their obligations hereunder, and

sell the Purchased Interest . . . ."  DuVall Aff. in Opp'n Ex. 2-3, at ¶¶ 2.4, 2.7.  She further

certified that

> [n]one of the execution and delivery by the Seller of this Agreement the
> consummation of the transactions contemplated hereby, or compliance by the
> Seller with any of the provisions hereof will (i) conflict with, or result in any
> violation of or default (with or without notice or lapse of time, or both) under, (A)
> any charter documents of [Vineyard Commons], (B) any contract, permit or
> license to which the Seller or [Vineyard Commons] is a party or by which they or
> the Purchased Interest is bound . . . .

*Id.* at ¶ 2.9.  The Regulatory Agreement provides that

> Owners shall not without the prior written approval of [HUD] . . . Convey, assign,
> or transfer any beneficial interest in any trust holding title to the property, or the
> interest of any general partner in a partnership owning the property, or any right
> to manage or receive the rents and profits from the mortgaged property.

Answer Ex. 9, at ¶ 6.  The Regulatory Agreement defines Owners to include "Vineyard

Commons Holdings, LLC and all members and managing members thereof . . . ."  *Id.* at ¶ 17.

Based on the Purchase Agreement, Gellatly bought a 5% membership interest in Vineyard

Commons.

The Trustee claims that regulatory approval was not necessary.  Reply Mem. 18.  Here,

the Trustee proffers evidence in support.  *Id.* at 18 n.7.  The Trustee provides what he describes

to be a "legal opinion [from the law firm of Nixon Peabody][12] . . . provided to Wallkill that

addressed a transfer of an interest in Vineyard Commons, and whether said transfer would

trigger a disclosure requirement to HUD."  *Id.*  The Trustee claims this evidence shows "the

disclosure was mandated only at purchase levels far above the percentage acquired by Gellatly."

*Id.*  Just as the Regulatory Agreement is only evidence that Ms. Barnett breached the Purchase

Agreement by delivering membership interests she had no authority to convey, so too is the

---

[12] It is not clear from the Trustee's papers who Nixon Peabody represents.

HUD opinion offered by the Trustee.  The Regulatory Agreement is not part of the contract

between Gellatly and Ms. Barnett at issue here.  The legal opinion from Nixon Peabody is also

extrinsic evidence.  The Regulatory Agreement suggests Ms. Barnett did not have the authority

to convey any membership interest in Vineyard Commons.  The legal opinion suggests Ms.

Barnett was not required to obtain HUD approval in this case before transferring membership

interests to Gellatly.  Both documents tend to establish opposite conclusions.  As such, there is a

genuine dispute of material fact and summary judgment as to this defense is inappropriate.

**E. Fraudulent Inducement on the Contract**

Gellatly's claims for fraudulent inducement are barred by the estoppel certificates.  The

Second Circuit has held that "in order to be considered sufficiently specific to bar a defense of

fraudulent inducement . . . , a guarantee must contain explicit disclaimers of the particular

representations that form the basis of the fraud-in-the-inducement claim."  *Mfrs. Hanover Trust*

*Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) (citing *Grumman Allied Indus., Inc. v. Rohr*

*Indus., Inc.*, 748 F.2d 729 (2d Cir. 1984)).  The case law dictates that "the mere general recitation

that a guarantee is 'absolute and unconditional' is insufficient . . . to bar a defense of fraudulent

inducement, and that the touchstone is specificity."  *Id.* at 316.  In *Fortunoff v. Triad Land*

*Associations*, the court applied this standard to determine whether the terms of the estoppel

certificates at issue there were specific enough to preclude a defense based on fraudulent

inducement.  906 F. Supp. 107, 117–18 (E.D.N.Y. 1995).  In that case, the estoppel certificates

stated that "the undersigned is duly indebted," "has no defenses, offsets or counter claims," and

further stated that the undersigned parties "agree to raise no defenses or offsets to our obligations

under and pursuant to the Note . . . ." *Id.* at 119 (citations omitted) (internal quotation marks

omitted).  The court found that the estoppel certificates were sufficiently specific to bar any

claim for fraudulent inducement based on this language.  *Id.*

Here, the estoppel certificates recite similar promises, including that Gellatly "is justly

indebted to [Ms. Barnett] in the amount of $2,253,794.00 pursuant to the terms of the Notes as

amended and as further amended and that [Gellatly] has no offsets or defenses to the debt

evidence by the Notes;" and that he "makes this covenant and declaration not only vfor [sic] the

benefit of the holder of the Notes, butr [sic] for the benefit of any subsequent holder of the Notes

or any of them . . . ."  Tillem Decl. Summ. J. Ex. G-6.  Gellatly warranted that he had no offsets

or defenses to payment on the Notes.  A defense would include fraudulent inducement.  As the

court in *Fortunoff* also held, the estoppel certificates are sufficiently specific to bar Gellatly's

fraudulent inducement defense.  *Fortunoff*, 906 F. Supp. at 119–20.

Even if the estoppel certificates did not bar Gellatly's fraudulent inducement defense, the

Court finds Gellatly's general statements that he was fraudulently induced to enter the contract

fall far short of any legal theory.  Gellatly states he decided to execute the Notes and Purchase

Agreements with Ms. Barnett based on her representations that the properties were correctly

zoned, that she provided accurate information and that improvements to land would be made.

Gellatly claims he was induced to enter into the contract based on the above representations, and

that he was denied the benefit of the bargain as she failed to keep any of her promises.  Def.'s

Mem. in Opp'n 18–19.

In New York, "it is well established that a party who is fraudulently induced to enter into

a contract may join a cause of action for fraud with one for breach of the same contract."  *Shlang

v. Bear's Estates Dev. of Smallwood, N.Y., Inc.*, 599 N.Y.S.2d 141, 142 (N.Y. App. Div. 1993)

(citations omitted).  To do so requires that the misrepresentations alleged "be more than merely

promissory statements about what is to be done in the future; they must be misstatements of

material fact or promises made with a present, albeit undisclosed, intent not to perform them."

*Shlang*, 599 N.Y.S.2d at 142 (citations omitted). "The mere fact that the expected performance

was not realized is insufficient to demonstrate that defendant falsely stated its intentions." *Nader*

*v. ABC Television, Inc.*, 150 F. App'x 54, 57 (2d Cir. 2005) (quoting *Laing Logging, Inc. v. Int'l*

*Paper Co.*, 644 N.Y.S.2d 91, 93 (N.Y. App. Div. 1996)) (internal quotation marks omitted).

Gellatly has not alleged any facts with sufficient particularity to clearly and convincingly show

Ms. Barnett's promises were anything other than mere promissory statements.  That her

representations did not materialize is insufficient as a matter of law to establish fraudulent

inducement.

<u>Conclusion</u>

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Trustee's

motion for summary judgment.  Summary judgment is GRANTED with respect to the amounts

due on the Wappinger Gardens Note.  The Court DENIES the Trustee's motion for summary

judgment with respect to the Highland Note, the Retail Center Note, the DJ Orchard Note and the

Vineyard Commons Note for the foregoing reasons above.

The Court will issue a separate order in conformity with this decision.

/s/ Cecelia G. Morris
_____

**Dated: December 29, 2015**
      **Poughkeepsie, New York**



**Hon. Cecelia G. Morris**
**Chief U.S. Bankruptcy Judge**